IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MATTHEW ALBIAN ALARCON,

    Plaintiff,

v.                                                                                                              Civ. No. 15-380 RB/SCY

MIKE HEREDIA,

    Defendant.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

**THIS MATTER** is before the Court on Defendant Mike Heredia's *Martinez* Report and Motion for Summary Judgment (Doc. 17), both filed February 15, 2017. Plaintiff, who is incarcerated and proceeding pro se, did not respond to the *Martinez* Report or Defendant Heredia's summary judgment motion.[1] For the reasons that follow, I recommend that summary judgment be entered in favor of Defendant Heredia, and that this action be dismissed with prejudice.

**I.     Procedural Background**

Plaintiff is an inmate in the custody of the New Mexico Corrections Department ("NMCD") and, at the times relevant to this case, was housed at Lea County Correctional Facility ("LCCF"), a designated Level III facility in Hobbs, New Mexico. Doc. 17 at 1. In 2014, Plaintiff was placed in Interim Level VI status at LCCF. *Id.* at 2. He was subsequently classified as a Level VI inmate and transferred to the Penitentiary of New Mexico ("PNM"). *Id.* In this lawsuit, Plaintiff alleges constitutional violations arising from the proceedings that resulted in his placement in Interim Level VI status at LCCF. Doc. 1. In Counts I and II of his complaint,

---

[1] In fact, Plaintiff has taken no action in this lawsuit since filing a financial certificate on December 10, 2015. Doc. 9.

1

Plaintiff specifically alleges due process violations arising from the procedures and hearings that led to his Interim Level VI placement. In Count III of his complaint, Plaintiff raises claims under the Eighth Amendment as well as for emotional distress and defamation of character.

Upon review of Plaintiff's complaint pursuant to 28 U.S.C. § 1915(e)(2) and Fed. R. Civ. P. 12(b)(6), the Court dismissed Plaintiff's claims for equitable relief without prejudice to his rights under the habeas corpus statutes. Doc. 4. The Court also dismissed three defendants as parties, leaving Defendant Heredia as the sole remaining defendant in this action. *Id.* On September 16, 2016, the Court dismissed Plaintiff's claim for monetary damages and declaratory relief arising from the wrongful deprivation of good-time credits. *See* Doc. 13.

On December 21, 2016, I directed Defendant Heredia to submit a *Martinez* Report addressing Plaintiff's remaining claims. *See Martinez v. Aaron*, 570 F.2d 317, 319-20 (10th Cir. 1978). The parties were notified that the *Martinez* Report may be used in deciding whether to grant summary judgment on Plaintiff's remaining claims, whether by motion or *sua sponte*, and that the parties should submit whatever materials they consider to be relevant to Plaintiff's claims. *See Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991).

In addition to submitting the *Martinez* Report, Defendant Heredia has moved for summary judgment on all of Plaintiff's remaining claims. Doc. 17. As stated earlier, Plaintiff did not respond to Defendant Heredia's motion for summary judgment, nor did he request an extension of time to do so.[2]

---

[2] Although this Court's local rules provide that a party's failure to file and serve a response in opposition to a motion constitutes consent to grant the motion, *see* D.N.M.LR-7.1(b), the Court nonetheless considers the merits of Defendant's summary judgment motion. *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002) (holding that "a party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party.").

## II.	Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party, here, Plaintiff. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

I liberally construe Plaintiff's filings because he is appearing pro se. Still, a pro se non-movant must "identify specific facts that show the existence of a genuine issue of material fact." *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (internal quotation marks omitted). Conclusory allegations are insufficient to establish an issue of fact that would defeat the motion. *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1180 (10th Cir. 2013). For purposes of summary judgment, a *Martinez* Report is treated like an affidavit and a prisoner's complaint may also be treated as an affidavit if it alleges specific facts based on the

prisoner's personal knowledge and has been sworn under penalty of perjury. *Hall*, 935 F.2d at 1111.

Due to his failure to respond to Defendant Heredia's summary judgment motion or the *Martinez* Report, Plaintiff has not identified any facts proffered by Defendant Heredia which he disputes nor has he pointed to evidence in the record to support his claims. *See* Fed. R. Civ. P. 56; *see also* D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted"). Thus, I will "accept as true all material facts asserted and properly identified in the summary judgment motion." *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002).

## III. Factual Background

The New Mexico Corrections Department ("NMCD") houses inmates at Lea County Correctional Facility ("LCCF") pursuant to a contract with Lea County. Doc. 17-3, Ex. R, at 106. LCCF is operated by the GEO Group, Inc., ("GEO"). *Id*. GEO is obligated to apply and enforce NMCD's policies and procedures, including those governing inmate classifications. *Id*. NMCD prison facilities and/or units are designated to house inmates at certain security levels ranging from Level I to Level VI. Doc. 17-1, Ex. M, at 24, 30. Of the six security levels established by the NMCD, "Security Levels V and VI" are "the most restrictive custody statuses for inmates posing the greatest risk to institutional security and the safety of others." Doc. 17-1, Ex. M, at 24.

NMCD Policy CD-143002 provides the criteria and procedures for placing an inmate in Level VI status. Doc. 17-2, Ex. O. According to that policy, security officials are permitted to place an inmate in Level VI status for various reasons, including if he poses a threat to the security of the institution. Doc. 17-2, Ex. O, at 47. A "Threat to the Security of the Institution" is defined as "[a]ny behavior or situation which involves, causes or is reasonably likely to cause

acts of violence, a substantial risk of death or serious injury to any person, substantial destruction of property, escape or risk of escape, and it also includes introduction of contraband or conspiracy or attempt to introduce contraband." Doc. 17-1, Ex. M, at 24.

LCCF is designated as a Level III facility. Doc. 17-3, Ex. R, at 107. Pursuant to NMCD Policy CD-143000, LCCF is permitted to place inmates in Level VI on an interim basis only. *Id*.; *see also* Doc. 17-1, Ex. M, at 30. Interim Level VI is defined as "[t]emporary placement of the inmate in the segregation unit by the shift supervisor or unit manager based on inmate meeting the Level VI placement criteria including threat to the security of the institution and/or protection needs." Doc. 17-1, Ex. M, at 23. NMCD Policy CD-143001 provides the criteria and procedures for placing an inmate in Interim Level VI status. Doc. 17-2, Ex. N. Pursuant to this policy, an inmate may be placed involuntarily into Interim Level VI status on the basis of "recent overt acts or reliable information, which reasonably leads the shift supervisor to believe in good faith that an inmate presents a threat to the security of the institution, may be a sexual predator, or otherwise meets the eligibility criteria for involuntary placement in Level VI." *Id*. at 33. When an inmate is involuntarily placed in Interim Level VI status, the shift supervisor/unit manager must document the reasons for the involuntary placement and give a copy of the document to the inmate within one working day, excluding weekends and holidays. *Id*. at 34. Placement in Interim Level VI can be based on information received from confidential informants. Doc. 17-3, Ex. R, at 108.

After the initial placement of an inmate into Interim Level VI status, officials must review the placement within 72 hours to determine whether the inmate should remain in Interim Level VI status. Doc. 17-2, Ex. N, at 32. Then, within five working days of an inmate's placement in Interim Level VI, the inmate must receive an Interim Level VI Classification

Committee hearing with notice of the hearing at least 48 hours before it occurs. *Id*. at 35-36. The inmate shall be provided the right to appear before the Committee to provide input. *Id*. at 36. The Committee determines whether the inmate meets eligibility criteria for Level VI status and whether the inmate should be referred to the Central Office Classification Bureau for transfer to a designated Level VI unit. *Id*. at 36.

When an inmate is referred to the Classification Bureau for transfer, the Classification Bureau Chief decides whether the inmate should be classified to Level VI within two working days of receipt of the referral. Doc. 17-2, Ex. O, at 51. If the Classification Bureau determines that an inmate should be placed at a Level V or Level VI facility, the inmate is transferred once space is available. *Id*. Upon arrival at a Level VI facility, the inmate is given an Initial Level VI Hearing, during which the inmate will be given the opportunity to appeal the decision placing him in Level VI. *Id*. at 54. When the Level VI placement is based on confidential information, the inmate is "given a written summary of the facts upon which this custody status is being requested, sufficient to allow the inmate to challenge the truthfulness of the facts and/or the need for this custody status, in a manner that would not inherently identify the confidential informant(s) or pose a threat to the security of the institution." *Id*. at 48. Certain criteria must be documented in order to determine the credibility of the confidential information. *Id*. at 48-49. The inmate also has the opportunity to appeal to the Director of Adult Prisons. *Id*. at 54.

1. **Plaintiff's Placement in Interim Level VI Status**

On March 12, 2013, Plaintiff was transferred to LCCF, where Defendant Heredia served as the Administrative Captain during the relevant time period. Doc. 17-1, Ex. L; Doc. 17-3, Ex. R, at 106. Between March 2013 and January 2014, security staff at LCCF received confidential information from multiple sources indicating that Plaintiff had threatened their safety. Doc. 17-3,

6

Ex. R, at 109. The sources requested that they be placed in protective custody because of concerns that Plaintiff would harm them. *Id*. Based upon this information, Plaintiff was placed in Interim Level VI status on March 6, 2014. *Id*.; *see also* Doc. 17-1, Ex. A. That same day, a Level VI/Interim Level VI/PHD/Disciplinary Placement form was completed and delivered to Plaintiff. *Id*. The form stated:

> As of March 6, 2014, Inmate Alarcon, Matthew Albian, NMCD # 63235 was placed into Involuntary Interim Level VI status specific to predatory, intimidating, and extortion of other inmates forcing them to seek protective custody. Three (3) inmates have positively identified Inmate Alarcon, Matthew Albian, NMCD # 63235 as the primary suspected inmate.

Doc. 17-1, Ex. A, at 1. On March 10, 2014, Plaintiff was given notice of an Interim Level VI Classification Committee Hearing.[3] Doc. 17-1, Ex. B, at 2. Plaintiff waived the 48 hour notice requirement for the hearing, *see id.*, and the Classification Committee at LCCF held a hearing later that same day.[3] Doc. 17-1, Ex. C, at 3. The Committee determined that Plaintiff was "to remain in involuntary Interim Level VI status pending further investigation by Capt. Heredia." *Id*. On March 14, 2014, the Classification Committee conducted a 7-day review of the Interim Level VI placement and decided to refer Plaintiff to the NMCD Classification Bureau for transfer to a Level VI facility. Doc. 17-1, Ex. D, at 4. The Committee recommended that Plaintiff remain in Interim Level VI status pending approval by the Classification Bureau for transfer to a Level VI facility. *Id*. Associate Warden John Beaird administratively approved the Classification Committee's recommendation on March 17, 2014. *Id*.

---

[3] According to Defendant Heredia, the notice and hearing forms were mistakenly marked "Initial" rather than "Interim" Level VI placement. *See* Doc. 17 at 5. This undisputed assertion is supported by the content of the forms, which dealt with Plaintiff's interim placement, and the fact that Initial Level VI hearings take place after transfer to a Level VI facility. *See* Doc. 17-1, Ex. M, at 22 (defining Initial Level VI hearing as "a hearing which takes place following the inmate's transfer to a Special Control Unit after the inmate has been approved . . . for Level V or Level VI classification); *id*. at 24 (defining special control unit as the "locations designated for the housing of inmates who are classified as Level V or Level VI").

7

On March 24, 2014, Associate Warden Beaird sent a memorandum to the Acting Classification Bureau Chief at NMCD, referring Plaintiff for placement in a Level VI facility. Doc. 17-1, Ex. E, at 5-6. The Acting Classification Bureau Chief approved Plaintiff for Level VI placement on May 21, 2014. Doc. 17-1, Ex. E, at 7. On May 23, 2014, Plaintiff was transferred to PNM, which is a Level VI facility operated directly by NMCD. Doc. 17-3, Ex. R, at 110.

After his transfer to PNM, Plaintiff was served notice on June 10, 2014 of an Initial Level VI Hearing. Doc. 17-1, Ex. G, at 9. The notice stated:

> On March 6, 2014, Inmate Matthew Alarcon #63235 was placed on Interim Level VI. The basis for this placement is due to his predatory and intimidating behavior at Lea County Correctional Facility. Inmate Alarcon exhibited predatory and intimidating behavior and extorted other inmates within GP-1 population, forcing some of them to seek Protective Custody placement. Three (3) inmates claimed Inmate Alarcon as an enemy. On January 17, 2014, MAH 003 claimed that Inmate Alarcon and others have fought with him due to their belief that he is an informant. On January 15, 2014 MAH 003 claimed he overhead Inmate Alarcon and others talking about the debt he owed, but that "he was too big to fight one on one, so they needed to roll in on him and take him out with more backup." Source MAH 002 fears bodily harm or acts of violence against his person. On May 24, 2013, MAH 001 claimed that Inmate Alarcon insisted he join the disruptive group "Cruces Boyz" and do "work" for them. Source MAH 001 was threatened with bodily harm and fears for his safety.

*Id*. The Initial Level VI Hearing was held on June 12, 2014. Doc. 17-1, Ex. H. The Classification Committee at PNM recommended placement in Level VI status based upon its finding that Plaintiff posed a threat to the security of the institution. *Id*. The Committee's recommendation was affirmed by the administration. *Id*. Plaintiff appealed his Level VI placement on June 12, 2014. Doc. 17-1, Ex. I. On July 7, 2014, the Director of Adult Prisons Division, Jerry Roark, affirmed the decisions of the NMCD administrators to place Plaintiff in Level VI. Doc. 17-1, Ex. K.

Following Plaintiff's transfer to PNM, Defendant Heredia did not have any authority to alter or amend Plaintiff's classification level. Doc. 17-3, Ex. R, at 110. Instead, changes to his

classification could only be made by classification officials at the facility where Plaintiff is incarcerated. *Id.* According to NMCD's "offender search" website, Plaintiff is no longer incarcerated at PNM.[4]

## IV. Analysis

As an initial matter, I address Plaintiff's use of the terms "disciplinary segregation" and "administrative segregation" interchangeably in his complaint. *See* Doc. 1 at 5 ("Petitioner requests immediate release from long term Disciplinary segregation and reclassified in the most appropriate level of custody"); *see also id.* at 7 ("Petitioner has been placed in Administrative segregation on March 6 . . ."). Defendant Heredia asserts that this case does not involve the disciplinary procedures in effect at LCCF but, rather, administrative classifications and security-level determinations. *See* Doc. 17 at 13. Defendant Heredia's position is supported by the undisputed facts set forth in the *Martinez* Report, which confirm that Plaintiff's placement in Interim Level VI status was an administrative decision rather than the result of a disciplinary proceeding. *See, e.g.*, Doc. 17-1, Ex. A (NMCD form showing Plaintiff was administratively placed in Interim Level VI status because he posed a threat to the security of the institution). Because it is clear and undisputed that Plaintiff is challenging his administrative placement in Interim Level VI status rather than a disciplinary proceeding at LCCF, I apply the law governing administrative classifications and security-level determinations to this case. *See Bailey v. Shillinger*, 828 F.2d 651, 652-53 (10th Cir. 1987) (concluding that administrative segregation -- that is, segregation for administrative reasons involving the safety of prison employees and other inmates -- did not invoke the same due process protections as disciplinary proceedings).

---

[4] Plaintiff is currently incarcerated at the Northeast New Mexico Detention Facility. *See* http://search.cd.nm.gov (last visited on March 1, 2018); *See United States v. Klein*, 589 F. App'x 909, 910 n.1 (10th Cir. 2014) (unpublished) ("tak[ing] judicial notice of information on 'prisoner locator' website[]").

### 1. Due Process

In Counts I and II of his complaint, Plaintiff alleges due process violations arising from the proceedings that led to his Interim Level VI placement. He specifically claims that he was not given a misconduct report or a summary of the charges and evidence against him, that he was not allowed to submit evidence or counter the charges against him at the hearings, that a proper investigation was not conducted, and that he was not given an opportunity to investigate the charges against him and "prove his innocence." Doc. 1 at 3.

In his summary judgment motion, Defendant Heredia contends that Plaintiff's due process claims are subject to dismissal because Plaintiff has no due process right to a particular inmate classification while in prison. *See* Doc. 17 at 12-13. Defendant argues in the alternative that even if Plaintiff had a constitutionally-protected liberty interest in remaining at Level III status, he was afforded all of the process necessary to protect his constitutional rights. *Id*. at 13.

"The Due Process Clause guarantees due process only when a person is to be deprived of life, liberty, or property. Changing an inmate's prison classification ordinarily does not deprive him of liberty, because he is not entitled to a particular degree of liberty in prison." *See Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994). The change in Plaintiff's classification from Level III to Interim Level VI therefore does not automatically trigger due process safeguards. *See, e.g., Bailey*, 828 F.2d at 652 (10th Cir. 1987) ("Classification of the plaintiff into administrative segregation does not involve deprivation of a liberty interest independently protected by the Due Process Clause."); *Sparks v. Foster*, 241 F. App'x 467, 471 (10th Cir. 2007) (unpublished)[5] ("Changing a prisoner's classification generally does not deprive him of

---

[5] The Court may cite to an unpublished decision to the extent its reasoned analysis has persuasive value with respect to a material issue. *See* 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").

liberty under the due process clause alone."); *Muniz v. Moore*, 375 F. App'x 841, 844 (10th Cir. 2010) (unpublished) (holding that the plaintiff's "incorrect classification claim fails because due process generally does not give prisoners rights to particular classifications").

However, a due process violation may occur if the change in classification "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see Muniz*, 375 F. App'x at 844 (noting that the Supreme Court has "recognized a due process liberty interest at stake when a prisoner's reclassification imposed an 'atypical and significant hardship'" (citing *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005)). "When determining whether administrative segregation involves an atypical and significant hardship, we consider four factors: (1) whether the segregation furthers a legitimate penological interest; (2) whether the conditions of the placement are extreme; (3) whether the placement increases the duration of confinement; and (4) whether the placement is indeterminate." *See Amin v. Voigtsberger*, 560 F. App'x 780, 785 (10th Cir. 2014) (unpublished) (citing *Estate of DiMarco v. Wyo. Dep't of Corr.,* 473 F.3d 1334, 1342 (10th Cir.2007). Here, there is no indication that Plaintiff's placement in Interim Level VI status increased the duration of his confinement or that the conditions of the placement were extreme. The restrictions Plaintiff alleges he suffered as a result of this placement – i.e., the "lack of communication with family members and friends", the "loss of his relationship with his wife", and limitations on phone calls – were not atypical in relation to the ordinary incidents of prison life nor did they pose a greater hardship on him than on other inmates. *See Bey v. Simmons*, 69 F. App'x 931, 932 (10th Cir. 2003) (unpublished) (finding that an inmate's allegations of mental anguish he suffered as a result of a classification error did not impose an atypical and significant hardship or threaten to lengthen his term of confinement); *Marshall v. Morton*, 421 F. App'x 832, 838 (10th

Cir. 2011) (unpublished) (stating that "restrictions on an inmate's telephone use, property possession, visitation and recreation privileges are not different in such degree and duration as compared with the ordinary incidents of prison life to constitute protected liberty interests under the Due Process Clause.").

Plaintiff's conclusory allegations in his complaint are insufficient to establish a violation of his rights under the due process clause. *Allen v. Figuera*, 416 F. App'x 771, 775 (10th Cir. 2011) (unpublished) ("conclusory allegations will not defeat a motion for summary judgment"). Because Plaintiff has not identified a legal basis to challenge his Interim Level VI placement under the due process clause, I recommend granting Defendant Heredia's motion and dismissing Counts I and II of Plaintiff's complaint with prejudice.

### 2. Eighth Amendment Claim

In Count III of his complaint, Plaintiff alleges that Defendant Heredia violated his right to be free from cruel and unusual punishment. Doc. 1 at 4. Liberally construing his unsworn complaint, Plaintiff alleges that Defendant Heredia violated his Eighth Amendment right to be free from cruel and unusual punishment when he allegedly threatened "to have harm inflicted upon [Plaintiff]" during the March 10, 2014 hearing that resulted in the Interim Level VI placement. Doc. 1 at 4. Plaintiff also appears to challenge the conditions of his confinement by claiming that the Interim Level VI placement resulted in a loss of communication with his family members, loss of his spousal relationship, and restrictions on phone calls. *Id*. at 7. Viewing the facts in the light most favorable to Plaintiff, I nonetheless find that his claims do not come within the purview of the Eighth Amendment's prohibition against cruel and unusual punishment.

Plaintiff's placement in Interim Level VI status out of a concern for the safety of other inmates does not automatically result in an Eighth Amendment violation. *See Bailey,* 828 F.2d at

653 (indicating that "placing an inmate in segregation as a preventative measure does not necessarily violate the Eighth Amendment."). This is because "[s]uch a decision falls within a prison official's broad administrative and discretionary authority to manage and control the prison institution." *Id*. Moreover, a prison official "can impose restrictive conditions of confinement upon [a prisoner] without violating the Eighth Amendment, as long as those conditions do not involve the wanton and unnecessary infliction of pain or are not grossly disproportionate to the severity of the crime warranting imprisonment." *Id.* (internal quotations omitted). Here, Plaintiff alleges that his Interim Level VI placement harmed him by denying him interaction with his family and friends and access to a telephone. However, this type of harm is not generally proscribed by the Eighth Amendment. *See Clemmons v. Bohannon,* 956 F.2d 1523, 1526 (10th Cir. 1992) (stating that "the core areas of any [viable] Eighth Amendment claim are shelter, sanitation, food, personal safety, medical care, and adequate clothing" (citation omitted)); *see also Speed v. Stotts,* 941 F. Supp. 1051, 1056 (D. Kan. 1996) ("The denial of privileges which normally accompanies confinement in administrative segregation does not amount to a denial of life's necessities or present a sufficiently serious potential for harm[.]"). In sum, Plaintiff's allegations in the complaint do not suggest a deprivation of his Eighth Amendment right to humane conditions of confinement. *See, e.g.*, *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (requiring "extreme deprivations" for viable conditions of confinement claim under the Eighth Amendment).

Plaintiff's allegation that Defendant Heredia verbally threatened him with harm also does not give rise to a constitutional violation. *See Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992) (noting that "[d]e minimus applications of force are necessarily excluded from the cruel and unusual punishment inquiry . . . . So are verbal threats and harassment." (internal

13

citations omitted)); *Jenner v. McDaniel*, 123 F. App'x 900, 904 (10th Cir. 2005) ("An 'idle threat' of impending physical harm that is not carried out will not suffice to state an Eighth Amendment claim."); *McBride v. Deer,* 240 F.3d 1287, 1291 n. 3 (10th Cir. 2001) ("[A]cts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment."); *Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir. 1979) (holding that sheriff's threat to hang prisoner following prisoner's request to mail some legal correspondence was insufficient to state a constitutional deprivation under § 1983); *Rivera v. Hassler*, 79 F. App'x 392, 394 (10th Cir. 2003) (holding that prison official's verbal harassment, teasing, singling out, and falsely reporting inmate for stalking her did not amount to cruel and unusual punishment) (unpublished); *Hyre v. Curry Cty. Det. Ctr.*, 2014 WL 12785116, at *1 (D.N.M. Nov. 17, 2014) (Armijo, J.) (dismissing inmate's § 1983 claim based on prison officials' threats to paralyze inmate from the waist up and break his arm because "mere words, without more, do not invade a federally protected right.").

The Court recognizes that inmates "have a constitutional right to be free from the terror of instant and unexpected death." *See Northington*, 973 F.2d at 1524. In this case, however, Defendant Heredia's purported threats do not suggest a show of deadly force. Nor has Plaintiff alleged that Defendant Heredia's threats caused him terror of instant and unexpected death. Thus, although there may be situations where verbal abuse and threats might amount to the level of cruel and unusual punishment, I do not find that this case presents such a situation. I therefore recommend dismissing Plaintiff's Eighth Amendment claim with prejudice.

### 3. Emotional Distress

In Count III of his complaint, Plaintiff alleges that he suffered emotional distress as a result of the Interim Level VI placement. He specifically asserts a loss of communication with

his family members, loss of his spousal relationship, and increased restrictions on phone calls. Doc. 1 at 14. This conduct does not rise to the level needed to establish intentional infliction of emotional distress under New Mexico law. *See Trujillo v. Northern Rio Arriba Elec. Co-op, Inc.*, 2002-NMSC-004, ¶ 25, 41 P.3d 333 (requiring conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."). Even if I were to assume, without deciding, that Plaintiff's placement in Interim Level VI status constituted extreme and outrageous conduct that resulted in severe emotional distress to Plaintiff, Plaintiff does not allege facts supporting the notion that Defendant Heredia intended to cause the severe emotional distress. *See id.* (in order to prove an intentional infliction of emotional distress claim, a plaintiff must prove: (i) the conduct in question was extreme and outrageous; (ii) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (iii) the plaintiff's mental distress was extreme or severe; and (iv) there is a causal connection between the defendant's conduct and the plaintiff's mental distress.). I recommend dismissal of this claim with prejudice.

   **4. Defamation of Character**

Defendant Heredia lastly argues he is entitled to summary judgment on Plaintiff's defamation of character claim. With regard to this claim, Plaintiff alleges in his complaint that unproven allegations that he was "gang active" and "a predatory inmate", that he "extort[ed] other inmates" or that he engaged in "assaultive behavior" resulted in a "defamation of [his] character because they have belittled me in every way possible, making [Plaintiff] appear to be something he is not." Doc. 1 at 7.

As the Tenth Circuit has recognized, "[h]arm to reputation alone does not state a proper federal claim, but rather is a matter for state tort law." *See Curiale v. Suitter, Axland & Hanson*,

142 F. App'x 352, 353 (10th Cir. 2005) (unpublished) (citing *Paul v. Davis*, 424 U.S. 693, 712 (1976)); *see also Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (stating that there is no "constitutional protection for the interest in reputation"); *see also Marner v. City of Aurora*, 624 F. App'x 665, 667 (10th Cir. 2015) (unpublished) (affirming dismissal of § 1983 claim for defamation of character because "injury to reputation is not a deprivation of a constitutionally protected property or liberty right"). Construing Plaintiff's defamation claim as a state tort claim brought under New Mexico law, I find the allegations in Plaintiff's complaint are not adequate to survive summary judgment. As Defendant Heredia points out in his summary judgment motion, Plaintiff has not alleged facts in his complaint establishing an actual injury to his reputation, which is an essential element of a defamation claim under New Mexico law. *See Smith v. Durden*, 2012-NMSC-010, ¶ 31, 276 P.3d 943, 951 (reiterating that "proof of actual injury to reputation" is necessary to establish prima facie case of defamation). In other words, Plaintiff cannot rely solely on conclusory assertions in his complaint that he felt "belittled" to establish a defamation claim. *See id.* (holding that plaintiff must establish "proof of actual injury to reputation—before a jury can award damages for mental anguish, humiliation, or any of the other recoverable harms listed in UJI 13-1010."). I therefore recommend granting summary judgment in favor of Defendant Heredia and dismissing Plaintiff's defamation claim with prejudice. *See Anderson,* 477 U.S. at 251 (stating that, to avoid summary judgment, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party).

## V. Conclusion

Based on the foregoing, I recommend granting Defendant Heredia's Motion for Summary Judgment (Doc. 17) and dismissing Plaintiff's claims with prejudice.

_____
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**